### Application of ROCKANA CARRIERS, Inc.

Railroad & Public Utilities Commission.

January 18, 1957.

Lewis H. Hill, Jr., Tampa and J. Kenneth Ballinger, Tallahassee, for applicant.

A. Pickens Coles and John F. Germany, Coles, Himes & Germany, Tampa, for Central Truck Lines, Inc., Great Southern Trucking Co. and Tamiami Trail Tours, Inc., as their interests might appear generally and as protestants to that portion of the application providing for transportation of certain commodities in bags.

Martin Sack, Jacksonville, for Fertilizer Carriers, Inc., as its interest might appear.

Richard A. Hollender, Norfolk, Va., for Seaboard Air Line R. R. Co., protestant.

Roderick K. Shaw, Tampa and P. C. Beverly, Wilmington, No. Car., for Atlantic Coast Line Ry., protestant.

R. K. Parsons, St. Augustine, for Florida East Coast Ry. Co., protestant.

John G. Hodges and Vincent P. Nuccio, both of Tampa, for Brotherhood of Locomotive Engineers, Brotherhood of Railroad Trainmen, Brotherhood of Railway Clerks, Brotherhood of Locomotive Firemen and Enginemen, Order of Railway Telegraphers, Order of Railroad Conductors and Brakemen, Federated Shop Craft, Brotherhood of Railroad Signalmen of America, and Brotherhood of Maintenance of Way Employees, protestants.

Frank D. Howard, Leesburg, for Brotherhood of Locomotive Firemen and Enginemen, protestant.

John E. Cicero, Miami, for the City of Miami as its interest might appear.

Guyte P. McCord, Jr., Assistant General Counsel, for the commission staff.

Chairman ALAN S. BOYD, commissioners JERRY W. CARTER and WILBUR C. KING participated in the hearing and disposition of this matter.

BY THE COMMISSION.

The commission held a public hearing on this application on November 13, 14 and 15 and December 3 and 4, 1956 in the Hillsborough County Courthouse, Tampa.

By this application, as amended, Rockana Carriers, Inc., seeks a certificate of public convenience and necessity to operate an auto transportation company in the common carriage of fertilizer, fertilizer materials and ingredients irrespective of how used and including specifically all commodities defined as fertilizer under rule 11 of section 3—transportation of freight—railroad rules of this commission, and in addition thereto dolomite, calcium, lime and like minerals (except crushed limestone for road building purposes) ; insecticides, salts, soda, ash, sand, sulphur, clay, rock and gravel; coal, coal products and byproducts; all the above in bulk (in other than liquid form) and in bags in truckload lots, from, to, and between all points and places in the state of Florida; excepting however, transportation of pebble phosphate or unground phosphate rock; and further excepting transportation of agricultural and hydrated lime in bags from Ocala, Florida to points and places in the state.

Rule 11 of section 3—transportation of freight—of the railroad rules of this commission provides as follows—*"Fertilizer—Articles embraced in—*11. The term 'fertilizer' embraces the following and

like articles, when intended to be used as fertilizers, to-wit: sulphate of ammonia, ashes, bone black, ground and dissolved bone, bone dust, castor pomace, cottonseed meal, cottonseed ashes, cotton seed, fish scraps, guano, superphosphate, gypsum, kainit, german salts, nitre cake, nitrate and sulphate of soda, oil cake, potash, fine ground plaster, salt cake, saltpetre, sulphur, muck, tank stuffs, and tobacco dust and sweepings, and like articles when intended to be used as fertilizers."

### Admissibility of Testimony Relating to Congestion and Safety of Traffic on the Highways

During the course of the hearing a question arose as to the admissibility on a common carrier application of testimony and evidence relating to the effect of the granting of the application upon congestion of traffic on the highways, or safety of traffic moving on the highways, under such operations in relationship to other private or public traffic permitted by law to move over the same roads or in the same territory. The commission admitted such testimony and evidence subject to reconsideration of its admissibility on final adjudication of the case.

Section 323.04, Florida Statutes 1955, specifically makes such matters a consideration on an application for private contract carrier certificate, and section 323.05 (6) also mentions it as a consideration in relation to an application for a "for hire" permit, but section 323.03, dealing with common carrier applications, is silent on this proposition. After giving further consideration to this matter the commission now finds such testimony and evidence to be admissible on common carrier applications as in the case of other motor carrier applications. Section 323.03—the common carrier section—requires that notice of hearing be given to the mayor or chief magistrate of each city and town through which the applicant desires to operate, to the chairman of the board of county commissioners of each county in which the proposed service would be operated and to the chairman of the state road department. Such would seem to contemplate that traffic on the highways would be a consideration in connection with the application. Also, in an early case construing chapter 13700, Laws of Florida, Acts of 1929 (the predecessor of chapter 323), Florida Motor Lines v. State Railroad Commission, 101 Fla. 1018, 132 So. 851, the Supreme Court stated—

"Chapter 13700, Laws of Florida, pertinent provisions of which appear in the statement filed herewith, contemplates: (1) The conservation of the highways constructed by taxation and other public funds in the state for the use of the public for transportation purposes; (2) the safety of persons and prop-

erty in the use of the highways; (3) a limited and regulated use of motor vehicles on the highways by persons and corporations engaged in the business of transportation for compensation on such highways, only as the public convenience and necessity may require. An intent of the statute is the permissive, limited and not unjustly discriminating use of the highways in the business of transportation for hire, only as the public necessity and convenience may require, and only as such use does not unduly impair the roads or the safety of their use by the public; . . ."

The court further said—

"In determining whether the public convenience and necessity require the proposed service to be rendered, there should be considered: (1) Whether the character and number of proposed vehicles may be operated without undue jeopardy to those traveling upon the roads; (2) . . . (3) whether the service in the territory or over the route or schedule line as proposed so differs in matters affecting public convenience and necessity, from other similar service being rendered, as to justify authorizing the additional or different service, in view of the rights of other carriers under the statute and of the taxpayers and general public in conserving the structure and safety of the highways . . ."

Although the 1929 statute was later held unconstitutional by the United States Supreme Court (Smith v. Cahoon, 283 U. S. 555, 75 L. Ed. 1264), on comparing it with the 1931 Act (now chapter 323) we find that its provisions contain no more definite language, if as much, as the 1931 Act relating to traffic on the highways, etc. The Supreme Court in an earlier case under this 1929 Act, Florida Motor Lines v. Railroad Commissioners, 100 Fla. 538, 129 So. 876 stated—

"Furthermore, the statute regulates the use of the public highways of the state in the business of transportation for compensation; and the statute contemplates that, in granting certificates of public convenience and necessity authorizing the use of the public roads in such transportation, the Railroad Commissioners shall give due consideration to the size, weight, and number of vehicles used in such business, so that vehicles not necessary for the public service may be excluded from the highways with a view to the proper use and preservation of the public roads and to the safety and convenience of the traveling public of the state who have primary rights in the preservation, safety, and use of the highways maintained by taxation."

Also, later cases construing the 1931 Act refer to such matters as considerations on applications for common carrier certificates. The Supreme Court in Central Truck Lines v. Railroad Commission, 118 Fla. 526, 160 So. 22, stated—

"Our system of laws providing for the supervision and regulation of transportation over the public highways is therefore simply a means for ascertaining and declaring the proper adjustment of proposed or established relationships between competing services qua modes of highway transportation and the paramount right of the state, in the interest of its citizens, to have the use of publicly constructed highways conserved for a general public use and protected against unnecessary traffic hazards as well as inordinate wear and tear occasioned by unnecessary carrier transportation being conducted for private profit thereon.

"Chapter 14764, supra, employs the phrase 'public convenience and necessity' as the legislative standard by which the exercise of the powers of the Railroad Commission vested under that act is to be measured. The phrase 'public convenience and necessity' has not been defined by the lawmakers in the act, nor indeed has it ever been defined in any precise way by the courts. Each case has therefore been largely left to be decided on its own peculiar facts when weighed in the light of the declared legislative purpose of the statute. That purpose, as clearly evidenced by its language and implication, was to so supervise, adjust, regulate, and control the co-ordination of public carrier services, both rail and motor, inter sese, as well as toward the state and the general public, as to attain therefrom the fullest measure of protection for the highways and at the same time insure the maintenance of an adequate transportation system to serve the essential needs of the people."

The court later in Great Southern Trucking Co. v. Douglas, 147 Fla. 522, 3 So. 2d 526, stated— "The chief considerations are the convenience and necessity of the public to be served and the use and the safety of the highways. These are matters for the consideration and determination of the Railroad Commission; . . ."

### Admissibility of Testimony Relating to Effect of Granting Application on Employees of Protesting Carriers

During the course of the hearing the question was also raised as to admissibility of testimony from employees of protesting carriers, or union representatives of such employees, relating to the resulting effect on such employees if the application is granted and

if the grant of same results in an employee or employees being laid off work by the competing carrier. Such testimony was received from witnesses H. B. Perkins, A. B. Johnson, L. W. Hughes, J. P. Raina and C. N. Robertson, subject to reconsideration in the final adjudication of the application.

Section 323.03 (3) provides in part as follows—". . . provided, that the commission in granting any such certificate shall take into consideration the effect that the granting of such certificate may have upon transportation facilities within the territory sought to be served by said applicant, . . ." Protestant railroads and labor unions argue that the individual railroad employees are a part of the protesting transportation facility, and therefore testimony relating to the effect that the granting of the application will have on an employee—if it results in the loss of employment by such employee—is a material consideration in the case.

We cannot agree that the statute is subject to this construction. The statute states that the commission shall take into consideration the effect that the granting of the application will have on other transportation facilities. It is apparent that this means *the facility as a whole* and not an individual component part of the facility. In this instance, a protesting railroad could attempt to show that if the application is granted it will be forced to lay off employees and the resulting effect upon it of the laying off of such employees (such as reduced efficiency)—but the resulting effect economically or otherwise on the employee would not be a proper consideration under the statute. To consider the effect on the employee would be to consider the effect on an individual rather than a transportation facility.

We do not consider such testimony to be admissible under the statute and it is therefore the ruling of this commission that such testimony of the above named witnesses be and it is hereby stricken.

### Transportation of Commodities
### in Bags in Truckload Lots

From the testimony and evidence adduced in this cause the commission finds applicant failed to prove that public convenience and necessity require any additional motor transportation of commodities in bags in truckload lots. It appears that the protesting regular route motor common carrier truck lines stand ready, willing and able to provide such transportation in bags in truckload lots as may be tendered to them. The motion of protestant truck lines made at the conclusion of the testimony to dismiss the application as to transportation in bags is therefore granted.

### Exempt Transportation

From the testimony and evidence adduced in this cause it appears that much of the transportation for which authority is sought is exempt from this commission's jurisdiction under the provisions of section 323.29, Florida Statutes, as was the case in docket 3913-CCT on the application of Haulsmore, Inc., decided by this commission on July 21, 1954 in order #2048. Haulsmore, Inc. has the same president and principal stockholders as the applicant here. In the order on that application the commission stated—

"There is some testimony in the record that crushed phosphate rock will move by truck from the mines direct to the consumers or grove owners for direct application to the ground. Some testimony indicates that various forms of phosphate will move from the mines to various fertilizer factories located in the state where it will be used in the preparation of commercial fertilizer. While this type transportation would be intrastate in character, it would at the same time be exempt from commission jurisdiction under section 323.29, Florida Statutes 1951. This statute provides that—

" 'There shall be exempted from the provisions of this chapter and from commission jurisdiction and control motor vehicles while engaged exclusively in transporting goods, wares, merchandise, horticultural, agricultural, or logs, lumber or other forest products, etc., from the point of production to that point of primary manufacture or from the point of production to the point of assembling the same or from either such point of production, primary manufacture or assembling to a shipping point of either a rail, water, or motor transportation company usually and generally serving the territory in which said production, manufacture, or assembling takes place.'

"This same statute also provides that—

" 'There shall be further exempted from commission jurisdiction and control motor vehicles used exclusively in transporting agricultural or horticultural products, supplies, and materials, including fertilizer and sprays when delivered direct to the growers and consumers or to an association of such growers and consumers.' "

Considering the record on the present application in the light of the above quoted statute, we find that transportation of the following commodities under the circumstances hereinafter set forth are exempt—

(1) *Ground phosphate rock* which is delivered to grove owners, ranchers and commercial spreaders for direct application to the ground. (It appears that this is an agricultural or horticultural product supply or

material delivered direct to a grower or consumer or an association of growers or consumers. No public convenience and necessity was shown for any other transportation of ground phosphate rock.)

(2) *Dolomite (agricultural limestone)* which is delivered to growers, ranchers or commercial spreaders for direct application to the ground or to fertilizer manufacturers for manufacture into mixed fertilizers. (In the former instance the exemption referred to in (1) above applies and in the latter instance it appears that such dolomite is moving from a point of production to a point of primary manufacture. There is some testimony to the effect that some dolomite moves to wholesalers and this would not be exempt but no public convenience and necessity was shown by applicant for such movement.)

(3) *Insecticides* delivered direct to growers or consumers. (It appears that these are agricultural or horticultural supplies. No public convenience and necessity was shown for any movement other than that which is exempt.)

(4) *Sand and phosphatic sand* delivered from a point of production (the sand pit) to a point of primary manufacture—to a fertilizer mixing plant where it is incorporated as a filler into mixed fertilizer. (This filler sand is heat treated, washed and dried by the sand company upon its being taken from the sand pit and before it moves to the fertilizer mixing plant. The heat treating, washing and drying simply purifies the sand and does not change its essential character.)

(5) *Clay* delivered from the point of production (the clay pit) to a point of primary manufacture—to a tile manufacturer where it is manufactured into tile.

(6) *Crushed rock* from the point of production (the point where it is mined and crushed) to a point of primary manufacture—to an asphalt road mix manufacturing plant where it is mixed into hot and cold asphalt mix for road paving.

## Public Convenience and Necessity Proved

From the record herein the commission finds that applicant proved public convenience and necessity for motor common carriage of the following commodities in bulk (in other than liquid form) within the territories stated below—

(1) *Mixed fertilizer* from St. Lucie, Duval, Broward, Hillsborough, Jackson, Pasco, Polk and Escambia counties, to points and places in Florida.

(2) *Ammoniated nitrate* from Hillsborough County to Duval, Broward and Jackson counties.

(3) *Ammoniated sulphate* from Hillsborough County to Polk County.

(4) *Calcium nitrate* from Orange County to Polk County.

(5) *Magnesium* from Hillsborough County to Pasco County.

(6) *Nitrate of soda* from Hillsborough County to Polk County.

(7) *Nitrogen* from Escambia County to Pasco County and from Hillsborough County to Polk County.

(8) *Sulphate of ammonia* from Orange County to Polk County.

(9) *Superphosphate and triple superphosphate* from Polk County to points and places in Florida; from Pasco County to Orange County; from Hillsborough County to Duval, Jackson and Polk counties; and from Hillsborough County to all points within 50 miles of Tampa, Florida.

(10) *Salt* from Hillsborough County to Polk County.

(11) *Sulphur* between points and places in Hillsborough County and from Hillsborough County to Polk, Pasco and Orange counties.

Although a large amount of mixed fertilizer moves or would move under the exemptions heretofore discussed it appears that there is a need for some additional non-exempt truck transportation from the fertilizer plants to dealers and warehouses in the areas above mentioned. Bulk motor carriage of mixed fertilizer to such dealers and warehouses would provide a more expedited service than that provided by rail transportation and thereby allow the fertilizer companies to supply their dealers with fertilizer quickly when needed, thus eliminating the necessity of the dealers carrying large inventories of such commodities.

The fertilizer materials listed (2) through (9) above are needed by fertilizer companies and mixing plants sometimes on very short notice. Truck transportation would provide a more expedited service than that available by rail and would eliminate the necessity of the fertilizer plants carrying large inventories of these commodities, which is necessary unless they can obtain them quickly when needed.

As to salt, witness Whitaker Landsdale, vice president of Jefferson Island Salt Co., testified that his company will stockpile salt at Tampa for movement to points in Florida but particularly to the new Kaiser Aluminum plant at Mulberry in Polk County. Walter H. Bast, production plant manager of Kaiser Aluminum & Chemical Corp., testified that his company is building a plant near Mulberry to make sodium fluosilicate; that the plant will be completed about February 1, 1957; that one of their raw materials, salt, will be furnished from Tampa by Jefferson Island Salt Co.; that his company designed its plant to lend itself to truck hauling of its raw materials; that they have no facilities for loading or unloading by rail; that trucks can be moved up against the brine pit and discharged into the pit, dumping from all sides into the pit. It is apparent that truck transportation is needed by this company for movement of salt and that it has distinct advantages over rail transportation.

As to sulphur, the testimony shows that this commodity is to be stockpiled at Tampa by Freeport Sulphur Co. and Texas Gulf Sulphur Co. and that shipments will be made from there to fertilizer and insecticide plants in the counties mentioned in (11) above. Truck transportation will have distinct advantages over rail in that it can be moved by truck direct to the melting pits of the fertilizer companies, eliminating the double handling necessary by rail. It will eliminate congestion caused by rail cars piling up on sidings at the plants due to unloading problems and will eliminate consequent demurrage on rail cars.

### Effect of Granting Application
### Upon Transportation Facilities
### Within Territory Involved

Much of the transportation involved in this application is exempt under section 323.29, Florida Statutes. Such transportation can be diverted from the rail lines to truck transportation without any restraint whatsoever. Also, a considerable amount of the transportation for which authority is here granted now moves by private trucks due to the advantages of truck transportation over rail. Diversion of this traffic to applicant would have no effect upon protestant rail lines. The amount of traffic which the rail lines will lose as a result of the grant of authority to applicant for which the commission here finds public convenience and necessity was proved is very speculative. It will depend to a large extent upon the service which the rail lines give to the shippers in the future. The grant of the application as here limited should have no appreciable adverse effect upon transportation facilities within the territory involved or upon transportation as a whole within said territory.

### Effect on Traffic on the Highways

As we have heretofore stated, much of the transportation of the commodities here under consideration is exempt under the Motor Transportation Act. The granting of this application as to the non-exempt portion for which public convenience and necessity was shown will add comparatively few additional vehicles to the highways. Also, the testimony shows that a number of fertilizer manufacturers use their own trucks in transportation of these commodities, which they have a legal right to do without obtaining any authority therefor. Applicant's trucks would simply replace some of these private trucks.

As to the weight and size of the trucks applicant will use in this transportation, they must come within the maximum weight and

size limitations provided by statute, just as is required of any other truck operating over the highways.

It is the finding of the commission that the granting of the application as herein limited would have no appreciable adverse effect upon congestion of traffic on the highways, or safety of traffic moving on the highways under such operations in relationship to other private or public traffic permitted by law to move over the same roads or in the same territory.

It is therefore ordered that certificate of public convenience and necessity #544 be and it is hereby issued to Rockana Carriers, Inc., P. O. Box 426, Tampa, authorizing the operation of an auto transportation company in the common carriage of the commodities heretofore set forth under the heading *"Public Convenience and Necessity Proved"* in bulk only in other than liquid form within the territories stated.

It is further ordered that—(1) the application in all other respects is denied; (2) the transportation heretofore set forth under the heading *"Exempt Transportation"* is declared to be exempt from this commission's jurisdiction and control under the provisions of section 323.29, Florida Statutes 1955; (3) the temporary authority heretofore granted to applicant is canceled; and (4) applicant shall file with the commission evidence of compliance with the commission's rules and regulations governing insurance and tariffs, and make proper reports to the state comptroller with respect to mileage taxes.